UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

             Plaintiff,                    Case No. 87-cr-80933

      vs.                            HON. Sean F. Cox


LARRY MARLOWE CHAMBERS,

     Defendant.

_____/

### United States' Response Opposing
### the Defendant's Motion for Compassionate Release
### or Request for Home Confinement

    Defendant Larry Chambers, along with his brother, led a large scale and well organized drug trafficking operation. The DTO operated over 200 "crack houses" in Detroit. Throughout the existence of the DTO, several hundred workers were employed by the Chambers brothers. Violence was used as a means of controlling and intimidating people inside and outside the operation.

1

Chambers is now serving a life sentence and he moves for compassionate release under 18 U.S.C. § 3582(c)(1)(A) based almost solely on the COVID-19 epidemic. His motion should be denied.

*First*, since January 2020, the Bureau of Prisons has been preparing for Covid-19, implementing strict precautions to minimize the virus's spread in its facilities. Following two recent directives from the Attorney General, the Bureau of Prisons is also assessing its entire prison population to determine which inmates face the most risk from Covid-19, pose the least danger to public safety, and can safely be granted home confinement. This process necessarily requires the Bureau of Prisons to identify the best candidates for release, ensure that their homes are suitable for home confinement, and arrange a way to quarantine each of them for 14 days. As of May 14, 2020, these directives have already resulted in at least 2,471 inmates being placed on home confinement. *See* BOP Covid-19 Website.

*Second*, Chambers does not qualify for compassionate release. Because Chambers has not sought compassionate release from the Bureau of Prisons based on Covid-19, as required under 18 U.S.C. § 3582(c)(1)(A), the Court does not have jurisdiction to address his

2

Covid-19-based argument until he exhausts his administrative remedies. Nor, in any event, does Chambers satisfy the statutorily mandated criteria for compassionate release. Because § 3582(c)(1)(A) requires that release be "consistent with" the Sentencing Commission's policy statements, Chamber's failure to meet the criteria in USSG § 1B1.13 alone forecloses relief. Even when Covid-19 is taken into account, Chambers' medical conditions do not satisfy the requirements in § 1B1.13(1)(A) & cmt. n.1. Although Chambers is 70 years old, he has not identified any underlying medical conditions that would put him at a high risk nor do the BOP records identify any.

His offenses and criminal history also make him a danger to the community, *see* USSG § 1B1.13(2). Chambers is not an ordinary drug dealer. He ran one of the largest drug operations in Detroit's history. He used guns and violence to control and intimidate people. He has a long and unsettling criminal history dating back to 1969. His criminal history includes first degree robbery, assault with intent to kill, grand larceny, burglary, arson, and various drug offenses.  There is no doubt that he is a dangerous individual. And he has no respect for the government or the court system. He was convicted of theft of

3

government property as well as escape from lawful confinement. There is nothing about this individual that would indicate that he would comply with the law or this Court's orders, much less any executive orders regarding social distancing or home confinement. And the § 3553(a) factors—which the Court must also consider under § 3582(c)(1)(A)—likewise do not support release.

## Background

Chambers is a dangerous career criminal. And he is currently serving a life sentence for serious and dangerous drug trafficking and gun offenses.

In the early 1980's, Chambers helped lead one of the biggest drug operations in the history of Detroit. The operation included hundreds of crack houses and employed hundreds of workers. Chambers specifically targeted and used juveniles in the operation because of the reduced penalties if they were caught. The operation was well organized and trafficked massive amounts of drugs. The operation employed a "wrecking crew" that used violence to intimidate and control its workers.

A jury found Chambers guilty of conspiracy to possess and distribute controlled substances in violation of 21 U.S.C. § 846; possession with intent to distribute and distribution of controlled substances in violation of 21 U.S.C. § 841(a)(1); possession of a firearm during a drug-trafficking crime in violation of 18 U.S.C. § 924(c); and operation of a continuing criminal enterprise in violation of 21 U.S.C. § 848. The district court sentenced Chambers to life plus five years of imprisonment to be followed by five years of supervised release.

After an appeal to the Sixth Circuit Court of Appeals, the case was remanded, and the district court vacated Chambers' conspiracy conviction and resentenced him to serve the same life sentence that had originally been imposed. The Sixth Circuit Court of Appeals affirmed the new sentence on appeal. *United States v. Chambers*, Nos. 93-1011/1028/1347, 1994 WL 12649 (6th Cir. Jan. 19, 1994). Thereafter, Chambers filed several unsuccessful § 2255 motions to vacate his sentence.

Chambers is serving a life sentence and is currently incarcerated at FCI Terre Haute. He is 70 years old, but has no underlying medical

conditions that put him at risk. Nevertheless, Chambers has moved for compassionate release, citing the Covid-19 pandemic.

Additionally, the government has confirmed that as of May 15, 2020, Chambers has not filed a request for compassionate release from the Bureau of Prisons. Because Chambers has not sought compassionate release from the Bureau of Prisons based on COVID-19, as required under 18 U.S.C. § 3582(c)(1)(A), the Court does not have jurisdiction to address his COVID-19-based argument until he exhausts his administrative remedies.

**Argument**

**I.   The Bureau of Prisons has responded to Covid-19 by protecting inmates and increasing home confinement.**

   **A.   The Bureau of Prisons' precautions have mitigated the risk from Covid-19 within its facilities.**

The Bureau of Prisons has reacted quickly to confront Covid-19's spread within its facilities. For over almost a decade, the Bureau of Prisons has maintained a detailed protocol for responding to a pandemic. Consistent with that protocol, the Bureau of Prisons began planning for Covid-19 in January 2020.

On March 13, 2020, the Bureau of Prisons began modifying its operations to implement its Covid-19 Action Plan and minimize the risk

6

of Covid-19 transmission into and inside its facilities. *See* [BOP Covid-19 Modified Operations Website](). Since then, as the worldwide crisis has evolved, the Bureau of Prisons has repeatedly revised its plan. The current plan, which is in effect until May 18, 2020, requires that inmates in every institution be secured in their assigned cells or quarters for at least 14 days to stop the spread of the disease. Only limited group gathering is allowed, and social distancing is maximized. Staff and inmates are issued face masks to wear in public areas. *See* [BOP FAQs: Correcting Myths and Misinformation](). And the movement of inmates and detainees between facilities is severely restricted, with exceptions only for medical treatment and similar exigencies.

Every newly admitted inmate is screened for Covid-19 risk factors and symptoms. Asymptomatic inmates with risk of exposure are placed in quarantine for a minimum of 14 days or until cleared by medical staff. Symptomatic inmates are provided with medical evaluation and treatment and are isolated from other inmates until testing negative for Covid-19 or being cleared by medical staff under the CDC's criteria. In areas with sustained community transmission, all staff are screened for symptoms. Staff registering a temperature of 100.4 degrees Fahrenheit

or higher are barred from the facility on that basis alone. A staff member with other symptoms can be placed on leave by a medical officer.

Other access to the facilities has likewise been restricted. Contractors are only permitted access if performing essential services, and any contractor who requires access is screened for symptoms and risk factors. Social and legal visits have been suspended to limit the number of people entering the facility and interacting with inmates. But to ensure that relationships and communication are maintained throughout this disruption, the Bureau of Prisons has increased inmates' telephone allowance to 500 minutes per month. Legal visits are permitted on a case-by-case basis after the attorney has been screened for infection.

Like all other institutions, penal and otherwise, the Bureau of Prisons has not been able to eliminate the risks from Covid-19 completely, despite its best efforts. But the Bureau of Prisons' measures will help federal inmates remain protected from Covid-19 and ensure that they receive any required medical care during these difficult times.

**B.    The Bureau of Prisons is increasing the number of inmates who are granted home confinement.**

The Bureau of Prisons has also responded to Covid-19 by increasing the placement of federal prisoners in home confinement. New legislation now temporarily permits the Bureau of Prisons to "lengthen the maximum amount of time for which [it] is authorized to place a prisoner in home confinement" during the Covid-19 pandemic. Coronavirus Aid, Relief, and Economic Security Act (CARES Act) § 12003(b)(2), Pub. L. No. 116-136, 134 Stat. 281, 516 (Mar. 27, 2020). The Attorney General has also issued two directives, ordering the Bureau of Prisons to use the "various statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing Covid-19 pandemic." (03-26-2020 Directive to BOP, at 1; *accord* 04-03-2020 Directive to BOP, at 1). The directives require the Bureau of Prisons to identify the inmates most at risk from Covid-19 and "to consider the totality of circumstances for each individual inmate" in deciding whether home confinement is appropriate. (03-26-2020 Directive to BOP, at 1).

The Bureau of Prisons' efforts on this point are not hypothetical. As of May 18, 2020, approximately 2,783 federal inmates have been

9

granted home confinement since the Covid-19 pandemic began, and

that number continues to grow. BOP Coronavirus FAQs. As the

Attorney General's directives have explained, these home-confinement

decisions have required evaluating several criteria:

> 1.) Each inmate's age and vulnerability to Covid-19;
>
> 2.) Whether home confinement would increase or decrease the inmate's risk of contracting Covid-19; and
>
> 3.) Whether the inmate's release into home confinement would risk public safety.

(03-26-2020 Directive to BOP; 04-03-2020 Directive to BOP).

These criteria not only make sense, but also fit the realities of the

Covid-19 pandemic far better than any other solution does. The Bureau

of Prisons cannot open its facilities' gates indiscriminately and unleash

tens of thousands of convicted criminals, en masse. It must focus on the

inmates who have the highest risk factors for Covid-19 and are least

likely to engage in new criminal activity. This is true not just to protect

the public generally, but to avoid the risk that a released defendant will

bring Covid-19 back into the jail or prison system if he violates his

terms of release or is caught committing a new crime. *See* 18 U.S.C.

§ 3624(g)(5); 34 U.S.C. § 60541(g)(2). The Bureau of Prisons' home-

confinement initiative thus appropriately focuses on the inmates who will most benefit from release and whose release is least risky.

The Bureau of Prisons must also balance another important consideration: how likely is an inmate to abide by the CDC's social-distancing protocols or other Covid-19-based restrictions on release? Many inmates—particularly those who have been convicted of serious offenses or have a lengthy criminal record—been already proven unwilling to abide by society's most basic norms. It is more than reasonable to evaluate whether a particular inmate would adhere to release conditions, social-distancing protocols, and stay-at-home orders during the pandemic. And if a prisoner would be unlikely to take any Covid-19 restrictions seriously, he would also be far more likely than the general public to contract and spread Covid-19 if released.

The Bureau of Prisons also must account for the current strain on society's first responders. Police departments in many cities have stretched to their limits as officers have either contracted Covid-19 or been placed in quarantine. Some cities, including Detroit, have seen spikes in shootings and murders. Child sex predators have taken advantage of bored school-aged kids spending more time online. Covid-

11

19-based fraud schemes have proliferated. There are real risks to public safety, and those risks will only increase if communities are faced with a sudden influx of prisoners. That is just one reason, among many, why the Bureau of Prisons must focus on releasing inmates who are the most vulnerable to Covid-19 and whose release will least endanger the public.

Finally, the Bureau of Prisons' home-confinement initiative allows it to marshal and prioritize its limited resources for the inmates and circumstances that are most urgent. For any inmate who is a candidate for home confinement, the Bureau of Prisons must first ensure that his proposed home-confinement location is suitable for release, does not place him at an even greater risk of contracting Covid-19, and does not place members of the public at risk from him. It must assess components of the release plan, including whether the inmate will have access to health care and other resources. It must consider myriad other factors, including the limited availability of transportation right now and the probation department's reduced ability to supervise inmates who have been released. All of those decisions require channeling resources to the inmates who are the best candidates for release.

12

Those types of system-wide resource-allocation decisions are difficult even in normal circumstances. That is why Congress tasked the Bureau of Prisons to make them and has not subjected the decisions to judicial review. 18 U.S.C. § 3621(b) ("Notwithstanding any other provision of law, a designation of a place of imprisonment under this subsection is not reviewable by any court."); *United States v. Patino*, No. 18- 20451, 2020 WL 1676766, at *6 (E.D. Mich. Apr. 6, 2020) ("[A]s a general rule, the Court lacks authority to direct the operations of the Bureau of Prisons."). It is especially true now, given the Bureau of Prisons' substantial and ongoing efforts to address the Covid-19 pandemic.

## II.    The Court should deny Chambers' motion for compassionate release.

Chambers' motion for a reduced sentence should be denied. A district court has "no inherent authority . . . to modify an otherwise valid sentence." *United States v. Washington*, 584 F.3d 693, 700 (6th Cir. 2009). Quite the contrary: a district court's authority to modify a defendant's sentence is "narrowly circumscribed." *United States v. Houston*, 529 F.3d 743, 753 n.2 (6th Cir. 2008). Absent a specific statutory exception, a district court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c). Those

statutory exceptions are narrow. *United States v. Ross*, 245 F.3d 577, 586 (6th Cir. 2001). Compassionate release under 18 U.S.C. § 3582(c)(1)(A) is equally narrow.

*First*, compassionate release requires exhaustion. If a defendant moves for compassionate release, the district court may not act on the motion unless the defendant files it "after" either completing the administrative process within the Bureau of Prisons or waiting 30 days from when the warden at his facility received his request. 18 U.S.C. § 3582(c)(1)(A); *United States v. Raia*, 954 F.3d 594, 595–96 (3d Cir. 2020). Because this requirement is a statutory one and not judicially crafted, it is mandatory. *Ross v. Blake*, 136 S. Ct. 1850, 1856–57 (2016); *Island Creek Coal Co. v. Bryan*, 937 F.3d 738, 751 (6th Cir. 2019).

*Second*, even if a defendant exhausts, he must show "extraordinary and compelling reasons" for compassionate release, § 3582(c)(1)(A), and release must be "consistent with" the Sentencing Commission's policy statements. As with the identical language in § 3582(c)(2), compliance with the policy statements incorporated by § 3582(c)(1)(A) is mandatory. *See Dillon v. United States*, 560 U.S. 817 (2010); *United States v. Jackson*, 751 F.3d 707, 711 (6th Cir. 2014). To qualify, a

14

defendant must have a medical condition, age-related issue, family circumstance, or other reason that satisfies the criteria in USSG § 1B1.13(1)(A) & cmt. n.1, and he must "not [be] a danger to the safety of any other person or to the community," USSG § 1B1.13(2).

*Third*, even if a defendant is eligible for compassionate release, the district court may not grant the motion unless the factors in 18 U.S.C. § 3553(a) support release. 18 U.S.C. § 3582(c)(1)(A); USSG § 1B1.13. As at sentencing, those factors require the district court to consider the defendant's history and characteristics, the seriousness of the offense, the need to promote respect for the law and provide just punishment for the offense, general and specific deterrence, and the protection of the public. 18 U.S.C. § 3553(a).

### A.   The Court is barred from granting release because Chambers has not exhausted his administrative remedies.

The Court must dismiss Chambers' motion, because he has not satisfied the exhaustion requirement for compassionate release under 18 U.S.C. § 3582(c)(1)(A). Until recently, only the Bureau of Prisons could move for compassionate release. The First Step Act of 2018 amended the statute, permitting defendants to move for it too. First

Step Act § 603(b), Pub. L. No. 115-319, 132 Stat. 5194, 5239 (Dec. 21, 2018).

But the provision permitting a defendant-initiated motion includes an exhaustion requirement. *Id.* A district court may not grant a defendant's motion for compassionate release unless the defendant files it "after" the earlier of (1) the defendant "fully exhaust[ing] all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf" or (2) "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility." 18 U.S.C. § 3582(c)(1)(A); *United States v. Raia*, 954 F.3d 594, 595 (3d Cir. 2020).

Statutory exhaustion requirements, like the one in § 3582(c)(1)(A), are mandatory. *Ross v. Blake*, 136 S. Ct. 1850, 1856–57 (2016). As the Sixth Circuit has explained, there is a "sharp divide" that "separates statutory from prudential exhaustion." *Island Creek Coal Co. v. Bryan*, 937 F.3d 738, 751 (6th Cir. 2019). Unlike judicially crafted requirements, statutory requirements may not be excused, even to account for "special circumstances." *Ross*, 136 S. Ct. at 1856–57.

16

Section 3582(c)(1)(A) is likely even a *jurisdictional* bar on the Court's authority to consider a motion for compassionate release. The Sixth Circuit has labeled § 3582(c)'s limitations "jurisdiction[al]." *Williams*, 607 F.3d at 1125. The statute "speak[s] to the power of the court rather than to the rights or obligations of the parties." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 274 (1994). And it delineates "when, and under what conditions," a court may exercise its "'adjudicatory authority.'" *Bowles v. Russell*, 551 U.S. 205, 212–13 (2007) (quoting *Eberhart v. United States*, 546 U.S. 12, 16 (2005)). But even if § 3582(c) requirements were not considered truly jurisdictional, they would still be mandatory claim-processing rules that must be enforced when a party "properly rais[es]" them. *Eberhart*, 546 U.S. at 19 (2005). Thus, regardless of how it is labeled, § 3582(c)(1)(A)'s exhaustion requirement is mandatory. *See Ross*, 136 S. Ct. at 1856–57; *United States v. Marshall*, 954 F.3d 823, 826–29 (6th Cir. 2020).

The only court of appeals to address this question has agreed. In *United States v. Raia*, 954 F.3d 594, 595–97 (3d Cir. 2020), the Third Circuit held that the Covid-19 pandemic does not permit inmates or district judges to bypass § 3582(c)(1)(A)'s exhaustion requirement.

17

Rather, "[g]iven BOP's shared desire for a safe and healthy prison environment, . . . strict compliance with § 3582(c)(1)(A)'s exhaustion requirement takes on added—and critical—importance." *Id.* at 597.

The majority of district courts to decide this question nationwide, including many in our district, have similarly held that a "failure to exhaust" under § 3582(c)(1)(A) "cannot be excused, even in light of the Covid-19 pandemic." *United States v. Alam*, No. 15-20351, 2020 WL 1703881, at *2–*3 (E.D. Mich. Apr. 8, 2020); *accord United States v. Shah*, No. 16-20457, 2020 WL 1934930, at *2 (E.D. Mich. Apr. 22, 2020); *United States v. Mathews*, No. 14-CR-20427-02, 2020 WL 1873360, at *2–*3 (E.D. Mich. Apr. 15, 2020). As one of the those decisions has explained, the few courts that have excused exhaustion under § 3582(c)(1)(A) have mistakenly relied on cases addressing *judge-made* exhaustion requirements, not *statutory* exhaustion requirements. *Mathews*, 2020 WL 1873360, at *2–*3.

Congress's reasons for § 3582(c)(1)(A)'s exhaustion requirement apply with even greater force during the COVID-19 pandemic. The Bureau of Prisons is already responding to the pandemic—not just through heightened safety measures, but by evaluating its entire prison

18

population for home confinement. By requiring a defendant to exhaust,
§ 3582(c)(1)(A) gives the Bureau of Prisons the opportunity to gather his
medical documentation and other records, evaluate his request, and
decide in the first instance whether it justifies either compassionate
release or some other form of relief. As the Third Circuit observed:
"Given BOP's shared desire for a safe and healthy prison environment,
. . . strict compliance with § 3582(c)(1)(A)'s exhaustion requirement
takes on added—and critical—importance." *Raia*, 954 F.3d at 597.

Chambers did not exhaust his administrative remedies. As noted
above, the government has confirmed with BOP that Chambers has not
sought administrative relief and has therefore not satisfied
§ 3582(c)(1)(A)'s mandatory exhaustion requirement.

**B.    There are no extraordinary and compelling reasons to
grant Chambers compassionate release.**

Even if Chambers had exhausted his administrative remedies,
compassionate release would be improper. Compassionate release must
be "consistent with applicable policy statements issued by the
Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A). Congress tasked the
Sentencing Commission with "describe[ing] what should be considered
extraordinary and compelling reasons for [a] sentence reduction" under

§ 3582(c)(1)(A), as well developing "the criteria to be applied and a list of specific examples" for when release is permitted. 28 U.S.C. § 994(t).

Because the Sentencing Commission has fulfilled Congress's directive in USSG § 1B1.13, that policy statement is mandatory. Section 3582(c)(1)(A)'s reliance on the Sentencing Commission's policy statements mirrors the language governing sentence reductions under 18 U.S.C. § 3582(c)(2) for retroactive guideline amendments. *Compare* § 3582(c)(1)(A) *with* § 3582(c)(2). When Congress uses the same language in the same statute, it must be interpreted in the same way. *Marshall*, 954 F.3d at 830. In both contexts, then, the Sentencing Commission's restraints "on a district court's sentence-reduction authority [are] absolute." *United States v. Jackson*, 751 F.3d 707, 711 (6th Cir. 2014); *accord Dillon v. United States*, 560 U.S. 817, 830 (2010).

The First Step Act did not change that. It amended only *who* could move for compassionate release under § 3582(c)(1)(A). It did not amend the substantive requirements for release. *United States v. Saldana*, No. 19-7057, 2020 WL 1486892, at \*2–\*3 (10th Cir. Mar. 26, 2020); *United States v. Mollica*, No. 2:14-CR-329, 2020 WL 1914956, at \*4 (N.D. Ala. Apr. 20, 2020). Section 1B1.13 remains binding.

Section 1B1.13 cabins compassionate release to a narrow group of defendants who are most in need. That policy statement limits "extraordinary and compelling reasons" to four categories: (1) the inmate's medical condition; (2) the inmate's age; (3) the inmate's family circumstances; and (4) other reasons "[a]s determined by the Director of the Bureau of Prisons," which the Bureau of Prisons has set forth in Program Statement 5050.50. USSG § 1B1.13 cmt. n.1. As the Tenth Circuit recently explained, a district court "lack[s] jurisdiction" to grant compassionate release when a defendant's circumstances do not fall within those categories. *Saldana*, 2020 WL 1486892, at *3.

Chambers appears to rely solely on his age as the only "medical" condition that would qualify him for compassionate release. But age alone does not make him eligible for compassionate release. And a review of his BOP medical records indicate that he has no underlying medical condition that would place him at a high risk. *See* Gov. Sealed Ex. 1: Defendant's BOP Medical Records. In fact, the 2019 medical records contain notes that indicate Chambers had "no complaints whatsoever," had "no health issues," and "denies any problems."

Chambers' 2020 medical reports contain nothing indicating he has any condition that would render him particularly vulnerable to COVID-19.

Nor is Chambers correct in suggesting that the Covid-19 pandemic should alter this analysis here. Even assuming, in other cases, that a defendant's risk from Covid-19 might make the difference in his eligibility for release under § 1B1.13, Chambers' circumstances do not satisfy that standard. Although Chambers is 70 years old, he does not have any underlying medical condition that puts him at a high risk. Nor does he explain why he would be safer outside prison given that presumably he would be returning to the Detroit area, which is now considered the epicenter of the COVID-19 epidemic in Michigan. In contrast, FCI Terre Haute has no reported COVID-19 cases. And as Chambers' prior conduct shows, he would also be unlikely to follow basic restrictions on release—much less the CDC's social-distancing protocols or a stay-at-home order. So it is hardly clear that Chambers faces a greater risk now than he would if released.

Nor does the Covid-19 pandemic by itself qualify as the type of inmate-specific reason permitting compassionate release. As the Third Circuit explained, "the mere existence of Covid-19 in society and the

possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread." *Raia*, 954 F.3d at 597. The Bureau of Prisons has worked diligently to implement precautionary measures reducing the risk from Covid-19 to Chambers and other inmates. Nothing in the statute or USSG § 1B1.13 supports the unbounded interpretation of § 3582(c)(1)(A) that he now asks this Court to adopt. *See Raia*, 954 F.3d at 597.

In his motion for release, Chambers also asserts that he has been rehabilitated and thus should be released. But under 28 U.S.C. § 994(t), rehabilitation alone is not considered an extraordinary and compelling reason.

Finally, Chambers asserts that subsequent changes to sentencing policy under the First Step Act warrant his release. Neither the policy statement nor the BOP Program Statement provides any basis for compassionate release based on reevaluation of the severity of a defendant's original sentence. In his motion, Chambers offers nothing more, and asks the Court to deem the non-retroactive change in the

First Step Act an "extraordinary and compelling reason" to reduce his sentence. (R. 1615, PageID.1452). This argument does not set forth an allowable basis for compassionate release.  Furthermore, Chambers should not be allowed to use the compassionate release provision as an "end-run around the Commission's authority to make certain Guideline changes not retroactive or Congress's decision to reduce sentences for some crimes but not others, or a means to redress perceived disparities with other sentenced defendants." *Fox*, 2019 WL 3046086, at *3; *see also United States v. Valdez*, No. 3:98-cr-0133–01-HRH, 2019 WL 7373023, at *3 (D. Alaska Dec. 31, 2019) ("[T]he fact is that law does evolve and there is nothing extraordinary about it.").

Chambers is also ineligible for compassionate release for another reason: he remains a danger to the community. Section 1B1.13(2) only permits release if a defendant is "not a danger to the safety of any other person or to the community." Chambers stands convicted of crimes involving guns and drugs. Guns and drugs are a lethal combination. The Sixth Circuit has repeatedly supported the proposition that drug trafficking, even without the presence of firearms or engagement in violence, is dangerous. *See United States v. Stone*, 608 F.3d 939 (6th Cir.

2010); *see also, e.g.*, *United States v. Hinton*, 113 F. App'x 76 (6th Cir. 2003) (conspiracy to distribute and possess over five kilograms of cocaine); *United States v. Hare,* 873 F.2d 796, 798 (5th Cir. 1989) (stating that "[t]he risk of continued narcotics trafficking on bail constitutes a risk to the community."); *United States v. Leon,* 766 F.2d 77, 81 (2d Cir. 1985) ("[I]t is clear that the harm to society caused by narcotics trafficking is encompassed within Congress' definition of 'danger.'"); *United States* v. *Stone*, 608 F.3d 939, 947 n.6 (6th Cir. 2010) (noting that run-of-the-mill drug dealers are routinely detained "even without any indication that the defendant has engaged in violence" because drug trafficking itself poses a danger to the community.)

Chambers is no run-of-the-mill drug dealer. He operated one of the largest drug trafficking operations in the history of Detroit. And he used guns and violence to run it. Chambers is a dangerous career criminal. His criminal history includes violent felonies like assault with intent to kill and arson. Chambers also has a history of escape and absconding, all of which indicate that he is a poor candidate for release into the community. This factor, too, forecloses relief here.

Chambers is not eligible for compassionate release.

## C.    The factors in 18 U.S.C. § 3553(a) strongly weigh against compassionate release.

Even when an inmate is statutorily eligible for a sentence modification based on "extraordinary and compelling reasons," compassionate release is not necessarily appropriate. Before ordering relief, the Court must consider the factors set forth in 18 U.S.C. § 3553(a) and determine that release is still appropriate. So even if the Court were to find Chambers eligible for compassionate release, the § 3553(a) factors should still disqualify him.

The nature and circumstances of the offense alone should disqualify him. He not only ran a large-scale drug trafficking operation that employed hundreds of workers, but many of them were juveniles. He used violence to maintain control and intimidate people inside and outside the operation.

In addition, his criminal history, which includes violent crimes and escape, indicates that he is not only extremely dangerous but there is no reason to believe that he would comply with any order of this court or any executive order regarding public safety.

Chambers is too dangerous to be released and his motion should be denied.

26

### III.   If the Court were to grant Chambers' motion, it should order a 14-day quarantine before release.

If the Court were inclined to grant Chambers' motion despite the government's arguments above, the Court should order that he be subjected to a 14-day quarantine before release.

### Conclusion

Chambers' motion should be denied.

Dated: May 21, 2020

Respectfully submitted,

MATTHEW SCHNEIDER
United States Attorney

*s/Laura L. Moody*
Laura L. Moody
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI  48226
Laura. moody@usdoj.gov
Phone:  (313) 226-0206

27

CERTIFICATE OF SERVICE

I hereby certify that on May 21, 2020, I caused the foregoing document to be electronically filed with the Clerk of the Court using the ECF system, and that a copy of the same will be served on the Defendant via U.S. postal mail to the following listed address:

Larry Marlow Chambers
Inmate Register No.:03009039
Terra Haute U.S. Penitentiary
P.O. Box 33
Terre Haute, IN 47808

*s/ Laura L. Moody*